UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONNIE DEAN HASKINS, III,[1] | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 17-CV-0486-CVE-JFJ |
| | ) |
| SCOTT CROW, Director[2] | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Before the Court is the 28 U.S.C. § 2254 petition for writ of habeas corpus (Dkt. # 1) filed by petitioner Ronnie Dean Haskins, a state inmate appearing pro se. Respondent filed a response (Dkt. # 15) in opposition to the petition and provided records from petitioner's state court proceedings (Dkt. ## 15, 16, 17). Petitioner did not file a reply. On consideration of the case materials and the parties' arguments, the Court denies the petition.

### *BACKGROUND*

Petitioner challenges the judgment and sentence entered against him in the District Court of Tulsa County, Case No. CF-2013-4272. In that case, the State charged petitioner with first degree malice murder for the fatal stabbing of Zachary Montgomery (count 1) and two counts of felonious

---

[1] There are discrepancies in the state court record regarding whether petitioner's correct name is Ronnie Dean Haskins, III, or Ronnie Dean Haskins, II. Dkt. # 15-1, Appellant's Br., at 6; Dkt. # 16-3, Tr. Trial vol. 4, at 22, 28 [373, 379]. Because petitioner identified himself as Ronnie Dean Haskins, III in the caption of his petition, the Court uses that name. Dkt. # 1, Pet., at 1.

[2] Pursuant to FED. R. CIV. P. 25(d), the Court substitutes Scott Crow, Director of the Oklahoma Department of Corrections, in place of Joe M. Allbaugh, the ODOC's former director, as party respondent. The Clerk of Court shall note this substitution on the record.

possession of a firearm (counts 2 and 4) and alleged that petitioner had more than two prior felony convictions. Dkt. # 16-6, O.R. vol. 1, at 102-07 [95-100] (third amended felony information).[3] Petitioner's case proceeded to a jury trial in June 2015. Dkt. # 16-1, Tr. Trial vol. 2, at 1 [cover page].[4] The following facts were developed at trial:[5]

> [Ronnie Dean] Haskins, also known as "Red," and Rodney Broomhall, also known as "Buddha," went to the home of the victim Zachary Montgomery after Haskins' daughter told [Haskins] that Montgomery touched her on the buttocks inappropriately. Gerald Fullhart was at Montgomery's home helping him move a mattress.
> Fullhart testified that they were all in the living room talking like they were all "buddies." Montgomery was smoking methamphetamine with a glass pipe. Fullhart testified that he was not smoking methamphetamine but Haskins and Broomhall testified that he was.
> According to Fullhart, Montgomery went into the bedroom and came out with a rifle, so he could show his friends the carvings on the rifle. The rifle had some words carved into the stock. After he showed off his rifle, he leaned it against the wall.
> Haskins pulled out a knife and invited Montgomery and Fullhart to look at his "new knife." Fullhart looked away for a moment and heard Montgomery yell. Fullhart looked to see Haskins' knife in Montgomery's chest. Fullhart then ran out of the house, but as he was leaving he heard Broomhall say, "don't you f'ing move." Once outside, Fullhart heard three gunshots.

---

[3]   For consistency, the Court's record citations refer to the CM/ECF header pagination. For citations to the original record (O.R.) and trial transcripts (Tr. Trial), the Court also provides the original page number in brackets unless the original page has no number or is the same as the CM/ECF header page number.

[4]   During the jury instructions conference, the State moved to dismiss the second count of felonious possession of a firearm (count 4), and the trial court dismissed that charge. Dkt. # 16-2, Tr. Trial vol. 3, at 90 [334]. Count three was a charge against a co-defendant.

[5]   Under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed correct unless a habeas petitioner rebuts that presumption "by clear and convincing evidence." Following review of the state court record, trial transcripts, trial exhibits, and other materials submitted by the parties, the Court finds that the factual background provided in the Oklahoma Court of Criminal Appeals' decision affirming petitioner's judgment and sentence is adequate and accurate. Therefore, the Court adopts the following summary of the evidence presented at trial as its own.

Fullhart ran to a neighbor's house to get help. Jeremy Thomas and Ashley Hemphill went to Montgomery's house to render aid. Thomas did not testify, but a video of his interview with police was introduced. Thomas saw two persons in a silver Pontiac leaving in a hurry. The car backed down the street, then came back by at a high speed. Thomas kicked the bottom of the door, and then entered the house by twisting the knob. He started trying to stop the flow of blood from Montgomery's neck, and told Hemphill to call 911. Thomas saw a rifle pointing down between Montgomery's legs. He also saw a wire wrapped around Montgomery's left index finger. The wire was going toward the rifle, but he didn't notice if it was attached to anything. Thomas heard Montgomery say "Red" and possibly "Red set me up." Montgomery was transported to the hospital where he succumbed to his wounds.

Broomhall testified that after Montgomery leaned the rifle against the wall, Haskins asked Montgomery to look at his knife. He said that Haskins then stabbed Montgomery in the neck. Broomhall testified that he ran out after Fullhart, asking Fullhart to come back. As Broomhall was in the driveway, he heard four to six gunshots. He then saw Haskins come out on the porch. Haskins and Broomhall then got into their silver Pontiac and left. While in the car, Haskins told Broomhall that he did it because Montgomery was messing with his daughter and [Montgomery] owed him money for drugs.

Haskins testified that he went to Montgomery's home to talk to him about making inappropriate comments to young female teenagers and patting his daughter on the bottom. He said he had talked to Montgomery about it before, but it wasn't enough of a deal to get into a fight about. When he went to the house, Montgomery was smoking methamphetamine. At some point Montgomery got up and got a rifle from the bedroom and was talking about some writing on it. Haskins said that the rifle had a wire attached to the trigger, but he could not see the other end of the wire. No other witnesses saw the wire attached to the rifle. Haskins testified that Montgomery had the rifle pointed down at the floor, but [Montgomery] raised it up and pointed it at him, so [Haskins] reacted and stabbed Montgomery. [Montgomery] raised [the rifle] up again and again, and each time Haskins stabbed Montgomery. After a final time, Haskins said he left, but on his way out he heard gunshots. Haskins testified he knew nothing about a gun (other than the rifle). He testified that he only carried a knife.

A neighbor, Camilla Surber, heard the gunshots, heard someone yelling "what did you do," and saw two men run from the house and get into a silver or champagne-colored car. She testified that the car backed down the street with its lights out, and then it returned, speeding back down the road with its lights on.

Moments later, Surber saw a female standing on the porch with a cell phone. She also heard some yelling "call 911" over and over. The female went in and out of the house, and then started running up and down the street until the fire department arrived. First responders arrived and the police department arrived and started their investigation.

> During the investigation, a search of Haskins' home revealed a Taurus .38 caliber revolver. Bullets fired from the gun were consistent with the bullets found in the victim's body, but the match was not conclusive enough to say that the bullets were fired from the same gun.
> The medical examiner testified that Montgomery died from a combination of multiple stab wounds and multiple bullet wounds. He testified that either the stab wounds or the bullet wounds alone would have been deadly.

Dkt. # 15-4, Haskins v. State, Case No. F-2015-590 (Okla. Crim. App. 2016) (unpublished) [hereinafter, OCCA Op.], at 1-4. At the conclusion of the trial, the jury convicted petitioner of first degree malice murder and felonious possession of a firearm, as charged in counts 1 and 2, both after former conviction of two or more felonies, and set punishment at life without the possibility of parole and a $10,000 fine (count 1) and life with parole and a $10,000 fine (count 2). Dkt. # 15-4, OCCA Op., at 1. The trial court sentenced petitioner accordingly and ordered the sentences to be served consecutively. Id.; Dkt. # 16-4, Tr. Sent. Hr'g, at 1, 6-8.

Represented by counsel, petitioner filed a direct appeal in the Oklahoma Court of Criminal Appeals (OCCA), raising three propositions of error. Dkt. # 15-1, Appellant's Br., at 1-2. In an unpublished opinion filed September 2, 2016, the OCCA denied each proposition on the merits and affirmed petitioner's convictions and sentences. Dkt. # 15-4, OCCA Op., at 1, 9-10. Petitioner did not seek further direct review in the U.S. Supreme Court and did not seek postconviction relief in state court. Dkt. # 1, Pet., at 2-3.

Proceeding pro se, petitioner filed the instant petition on August 25, 2017, seeking federal habeas relief on two of the three claims he raised on direct appeal. Dkt. # 1, Pet., at 1. Respondent contends that 28 U.S.C. § 2254(d) bars petitioner's request for habeas relief as to both claims and urges the Court to deny the petition. Dkt. # 15, Resp., at 5, 15.

*DISCUSSION*

**I.      Legal framework**

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs this Court's review. Because petitioner is a state prisoner he cannot obtain federal habeas relief unless he shows that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And because the OCCA adjudicated his federal claims on the merits, this Court may not grant habeas relief unless petitioner first demonstrates that the OCCA's adjudication of his claims "resulted in a decision that" either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," id., or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)); see also House v. Hatch, 527 F.3d 1010, 1015 (10th Cir. 2008) (explaining that "Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings").

"A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Court on a 'set of materially indistinguishable facts.'" Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (quoting Williams, 529 U.S. at 412-13). "A state court's decision unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme

5

Court decisions but applies those principles in an objectively unreasonable manner." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)). But "a state court's application of federal law is only unreasonable if 'all fairminded jurists would agree that the state court decision was incorrect.'" Id. (quoting Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014)). Lastly, "a state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" Wood, 907 F.3d at 1289 (quoting Byrd v. Workman, 645 F.3d 1159, 1170-72 (10th Cir. 2011)). And, in considering a challenge to the state court's factual determination, a federal court must presume the correctness of the state court's factual findings unless the petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The standards set forth in § 2254(d) make it difficult, but not impossible, to obtain federal habeas relief on "claims already rejected in state proceedings." Harrington v. Richter, 562 U.S. 86, 102 (2011). This is by design because the federal remedy of habeas corpus is intended to be "a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

With this framework in mind, the Court turns to petitioner's claims.

**II.    Analysis**

Petitioner claims that his state-court judgment is constitutionally infirm for two reasons: (1) the State failed to prove that he did not kill the victim in self-defense and (2) trial counsel

provided ineffective assistance by failing to investigate the case and present certain evidence and witnesses at trial. Dkt. # 1, Pet., at 3, 5.[6]

Respondent concedes, and the Court finds, that petitioner timely filed his habeas petition, see 28 U.S.C. § 2244(d)(1)(A), and exhausted both claims by presenting them to the OCCA on direct appeal, see id. § 2254(b)(1)(A). Dkt. # 15, Resp. ,at 2. But respondent contends that § 2254(d) bars relief because petitioner has not demonstrated that the OCCA's decision is contrary to clearly established federal law, involves an unreasonable application of clearly established federal law or is based on an unreasonable determination of the facts presented in state court. Id. at 5-27.

### A.    Claim one: sufficiency of evidence to rebut self-defense

Petitioner claims that his murder conviction rests on a violation of his Fourteenth Amendment right to due process because the State failed to prove, beyond a reasonable doubt, that he did not act in self-defense when he killed Montgomery. Dkt. # 1, Pet., at 3; Dkt. # 15-1, Appellant's Br., at 17-20.

Under the Due Process Clause of the Fourteenth Amendment, a criminal defendant cannot be convicted of a crime unless the state proves, beyond a reasonable doubt, every essential element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 316 (1979); In re Winship, 397 U.S. 358, 364 (1970). Jackson guides review of challenges to the sufficiency of the evidence to support a criminal conviction and provides that "the relevant question is whether, after viewing the evidence

---

[6]   As apparent support for both claims, petitioner attached a copy of the OCCA's opinion with handwritten notes in the margins signifying his disagreement with the OCCA's factual findings and its analysis. Dkt. # 1, Pet., at 9-17. Petitioner's arguments are not well developed, but because he appears pro se, the Court must liberally construe his pleadings. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). In an effort to better understand his arguments, the Court has also considered the arguments he made in the appellate brief he submitted to the OCCA on direct appeal (Dkt. # 15-1).

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original); see also Coleman v. Johnson, 566 U.S. 650, 656 (2012) ("[T]he only question under Jackson is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."); Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993) (noting that the Jackson "standard requires [the reviewing court] to accept the jury's resolution of the evidence as long as it is within the bounds of reason").

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman, 566 U.S. at 651. "First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusion should be drawn from evidence admitted at trial.'" Coleman, 566 U.S. at 651 (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)). Thus, a state court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos, 565 U.S. at 2. "[S]econd, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.'" Coleman, 566 U.S. at 651 (quoting Cavazos, 565 U.S. at 2).

Here, the OCCA identified the Jackson standard as the legal principle governing petitioner's due-process claim, stating that it would not "reverse the findings of a properly instructed jury unless the evidence, viewed in a light most favorable to the State, is such that no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt," and the OCCA

found the evidence sufficient to support the jury's verdict. Dkt. # 15-4, OCCA Op., at 6.[7] Thus, petitioner cannot show that the OCCA's decision is "contrary to" clearly established federal law. See Williams, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

Likewise, on the record presented, petitioner cannot demonstrate that the OCCA either unreasonably applied Jackson or based its decision on an unreasonable determination of the facts. Under Oklahoma law,[8] to obtain petitioner's conviction for first degree malice murder, the State had to prove, beyond a reasonable doubt, that petitioner deliberately and unlawfully caused Montgomery's death. Robinson v. State, 255 P.3d 425, 432 (Okla. Crim. App. 2011); OKLA. STAT. tit. 21, § 701.7 (2011). The evidence presented at trial, including petitioner's own testimony, established that he fatally stabbed Montgomery. Dkt. # 15-4, OCCA Op., at 5-6; Dkt. # 16-3, Tr. Trial vol. 4, at 15, 17-18, 35, 63 [366, 368-69, 386, 414]. The only question was whether he did so in self-defense after Montgomery pointed a rifle at him. Dkt. # 15-4, OCCA Op., at 5-6. Because self-defense is an affirmative defense, petitioner had to show that "he had reasonable grounds to believe he was in imminent danger of death or great bodily injury" from Montgomery's actions.

---

[7] The OCCA did not expressly cite Jackson. Dkt. # 15-4, OCCA Op., at 6. The OCCA instead cited Easlick v. State, 90 P.3d 556, 559 (Okla. Crim. App. 2004), and Spuehler v. State, 709 P.2d 202, 203 (Okla. Crim. App. 1985). Id. But the OCCA adopted the Jackson standard in Spuehler and held in Easlick that it would apply that standard in all future cases. Easlick, 90 P.3d at 559; Spuehler, 709 P.2d at 203-04. The OCCA's decision to cite state law rather than clearly established federal law does not impact this Court's duty to view the OCCA's decision with deference. Wood, 907 F.3d at 1289.

[8] As respondent points out, determining whether habeas corpus relief is warranted under Jackson, "requires explicit reference to the substantive elements of the criminal offense as defined by state law." Dkt. # 15, Resp., at 8 (quoting Jackson, 443 U.S. at 324 n.16).

9

Robinson, 255 P.3d at 432; OKLA. STAT. tit. 21, § 733 (2011). And because there was sufficient evidence to submit the issue of self-defense to the jury, the State had to prove, beyond a reasonable doubt, that petitioner did not act in self-defense. McHam v. State, 126 P.3d 662, 667 (Okla. Crim. App. 2005). The trial court instructed the jury on self-defense and on the State's burden to disprove it. Dkt. # 15-4, at 6; Dkt. # 16-7, O.R. vol. 2, at 51-58 [247-54].

In reviewing the sufficiency of the evidence, the OCCA found that petitioner's self-defense claim was based on his own testimony and that "[o]ther testimony contradicted [his] self-defense claim." Dkt. # 15-4, OCCA Op., at 6. The OCCA specifically found that petitioner was the only person in the room at the time of the stabbing who testified that Montgomery pointed a rifle at him. Id. at 6. Not only is this finding presumed correct, see 28 U.S.C. § 2254(e)(1), but also the trial transcripts clearly support it. Both Fullhart and Broomhall testified that they saw petitioner stab Montgomery, but neither Fullhart nor Broomhall testified that Montgomery pointed the rifle at petitioner before the stabbing. Fullhart testified that Montgomery retrieved his rifle from the bedroom, showed the men carvings on the rifle, and leaned the rifle against the wall. Dkt. # 16-1, Tr. Trial vol. 2, at 155, 161 [192, 198]. Fullhart did not see Montgomery point the gun at anyone or hear him make any verbal threats. Id. at 162 [199]. Broomhall also testified that Montgomery showed the men carvings on the rifle and that he did not see Montgomery point the rifle at anyone in the room. Id. at 176, 183 [213, 220]. Fullhart and Broomhall both testified that after Montgomery leaned the rifle against the wall, petitioner asked Montgomery to look at petitioner's knife and then used the knife to stab Montgomery in the neck. Id. at 162-64, 184 [199-200, 221]. Like Fullhart and Broomhall, petitioner testified that Montgomery retrieved the rifle from his bedroom and mentioned carvings on the rifle. Dkt. # 16-3, Tr. Trial vol. 4 at 33-34, 56 [384-85, 407]. Despite the fact that

all three men testified that Montgomery brought the rifle out to show off carvings on the rifle, petitioner testified that he "couldn't understand why [Montgomery] would come back in the room carrying a rifle" because he and Montgomery had just been discussing Montgomery's inappropriate touching of petitioner's teenage daughter, a topic petitioner testified "wasn't serious." Dkt. # 16-3, Tr. Trial vol. 4, at 33-34 [384-85]. More importantly, as the OCCA found, only petitioner testified that Montgomery repeatedly "raise[d] the barrel up" and "towards" petitioner, causing petitioner to stab him. Id. at 35-36 [386-87]. In addition, while petitioner essentially told the jury that he had to defend himself from a meth-crazed Montgomery who was brandishing a rifle, id., at 35-38 [386-89], Broomhall testified that as he and petitioner drove away from the house after the stabbing, petitioner told him that he stabbed Montgomery "because [Montgomery] was messing with [petitioner's] daughter and [Montgomery] owed him money for drugs." Dkt. # 16-1. Tr. Trial vol. 2, at 187 [224].

Citing some of these conflicts in the testimony, petitioner appears to argue that the OCCA's decision is based on an unreasonable determination of the facts. Specifically, he alleges that (1) he never made a statement that Montgomery inappropriately touched his daughter, Dkt. # 1, Pet., at 9, (2) there was "proof of wire" around Montgomery's left index finger, id. at 11, (3) some of Broomhall's testimony was "made up," id., (4) Camilla Surber "lied for Broomhall," id. at 12, (5) there was evidence supporting his self-defense claim (namely, "wire," "gun," "raised gun," and "dispute"), id. at 13, and (6) there was evidence that petitioner was at Montgomery's home "on a disagreement" which, in petitioner's view, supports his testimony that Montgomery threatened him with the rifle, id. at 14. But, as the OCCA reasoned, "[t]he jury was in the best position to weigh the credibility of th[e] evidence," Dkt. # 15-4, OCCA Op., at 6, and to resolve conflicting testimony. Petitioner's disagreements with the OCCA's factual findings thus fall short of overcoming the

11

significant deference that must be accorded first, to the jury's findings that support its verdict and second, to the OCCA's determination that those findings are within the bounds of reason. Grubbs, 982 F.2d at 1487.

For the reasons just discussed, the Court agrees with respondent that § 2254(d) bars habeas relief on claim one.

### B. Claim two: ineffective assistance of trial counsel

Petitioner claims he was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to conduct a reasonable investigation and failed to present certain witnesses and evidence at trial. Dkt. # 1, Pet., at 5; Dkt. # 15-1, Appellant's Br., at 20-26. In his petition, he alleges that trial counsel "didn't look for witnesses" and should have presented evidence to "explain to the jury the effects of meth[amphetamine]." Dkt. # 1, Pet., at 16-17.

The Sixth Amendment guarantees a defendant's right to the assistance of counsel in criminal proceedings. Strickland v. Washington, 466 U.S. 668, 686 (1984). And "effective assistance" is necessary "to ensure a fair trial." Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. To establish a Sixth Amendment violation, a defendant must demonstrate deficient performance and resulting prejudice. Id. at 687. "The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." Id. at 688. And an attorney's deficient performance "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Thus, a defendant alleging general ineffectiveness "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

12

A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693-94.

The Strickland standard, as applied on direct appeal, is "highly deferential." 466 U.S. at 689. The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Under § 2254(d), habeas review of a Strickland claim that was adjudicated on the merits in state court is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105. And because "[t]he Strickland standard is a general one . . . the range of reasonable applications is substantial," making it even more difficult for a habeas petitioner to show that the state court's application of Strickland was objectively unreasonable. Id

On direct appeal, petitioner alleged that trial counsel was ineffective for failing to investigate his case and present certain evidence and witnesses at trial. Dkt. # 15-1, Appellant Br., at 20-26. To support his claim, petitioner asked the OCCA to remand his case to the state district court for an evidentiary hearing on the adequacy of counsel's investigation and he submitted affidavits from four witnesses: Sarah Smith, Gordon Turner, Christine Seitz and Tollie Belt. Dkt. # 15-4, Appl. for Evidentiary Hr'g, at 7; see Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2020) (requiring applicant seeking remand for evidentiary hearing to show "by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence").

The OCCA denied petitioner's request for an evidentiary hearing, finding that petitioner did not "show[] by clear and convincing evidence that there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained of evidence." Dkt. # 15-4, OCCA Op., at 8-9.[9] The OCCA reasoned, in part, that petitioner "provided no information regarding the availability of [the four] witnesses at the time of trial" and "no description of the investigatory steps that could have been utilized by trial counsel to discover these witnesses." Id. at 8. It further stated that "[t]he only evidence that was available to trial counsel is evidence from the medical examiner that a quantifiable amount of methamphetamine was found in the victim's system during the autopsy." Id. at 8-9. Applying Strickland, the OCCA found no Sixth Amendment violation arising from counsel's failure to present that evidence. Id. at 6-9. The OCCA reasoned that trial counsel did not perform deficiently by failing to present evidence of the amount of methamphetamine in Montgomery's system because "[t]he jury was already aware that Montgomery had ingested methamphetamine before his death, and [petitioner] ha[d] not shown that the level of methamphetamine would have aided his case in any manner." Id. at 9.

Because the OCCA applied Strickland in denying petitioner's Sixth Amendment claim, petitioner cannot show that the OCCA's decision is "contrary to" clearly established federal law. See Williams, 529 U.S. at 405-06 (discussing when a decision is "contrary to" Supreme Court

---

[9] The OCCA did not discuss the affidavits in denying petitioner's application for an evidentiary hearing. Dkt. # 15-4, OCCA Op., at 8-9. But, as respondent states, the U.S. Court of Appeals for the Tenth Circuit has held that even in cases where the OCCA disposes of a Rule 3.11 application without discussing the non-record evidence, the federal court "can be sure that the OCCA in fact considered the non-record evidence in reaching its decision." Dkt. # 15, Resp., at 17 (quoting Lott v. Trammell, 705 F.3d 1167, 1213 (10th Cir. 2013)).

precedent). And, for several reasons, petitioner cannot show that the OCCA's decision involves an unreasonable application of Strickland or is based on an unreasonable determination of the facts.

First, "the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney." Boyle v. McKune, 544 F.3d 1132, 1139 (10th Cir. 2008)). Characterizing this decision as one involving trial strategy does not mean that counsel's decision regarding which witnesses to call is insulated from review. But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Here, the OCCA found that petitioner, in his application for an evidentiary hearing, failed to provide "information regarding the availability of [the four] witnesses at the time of trial." Dkt. # 15-4, OCCA Op., at 8. Without evidence in the record that petitioner discussed these potential witnesses with trial counsel before trial, it was not objectively unreasonable for the OCCA to reject petitioner's claim that counsel was ineffective for failing to interview them or present their testimony. See Strickland, 466 U.S. at 691 (noting that "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant" and further noting that the reasonableness of counsel's conduct must be "viewed as of the time of counsel's conduct").

Second, having independently reviewed the affidavits of the proposed witnesses, the Court finds nothing objectively unreasonable about the OCCA's determination that petitioner failed to show even "a strong possibility trial counsel was ineffective for failing" to interview them or present their testimony at trial. Dkt. # 15-4, OCCA Op., at 8. As respondent explains, none of petitioner's


four proffered witnesses was present at Montgomery's house when petitioner fatally stabbed Montgomery. Dkt. # 15, Resp., at 19- 25; see also Dkt. # 15-3, Appl. for Evidentiary Hr'g, at 9-10 (Smith Aff.), 11-12 (Turner Aff.), 13-14 (Seitz Aff.), 15 (Belt Aff.). As a result, none of these four witnesses could have offered testimony to support petitioner's claim that he killed Montgomery in self-defense. Arguably, some of the proffered testimony could have undermined that defense. For example, Smith would have testified that she knew petitioner's daughter had accused Montgomery of rape. Dkt. # 15-3, Appl. for Evidentiary Hr'g, at 10 (Smith Aff.). Seitz and Belt would have testified that sometime after Montgomery's murder each of them separately overheard Broomhall telling another person that he shot and killed a man. Dkt. # 15-1, Appl. Evidentiary Hr'g, at 13, (Seitz Aff.), 15 (Belt Aff.). More specifically, Seitz would have testified that she knew Broomhall was a prospective member of a white supremacist gang, that she heard him say he shot a guy with a revolver while his "brother" stabbed the victim, and that the victim had allegedly raped his "brother's" daughter. Id. at 13 (Seitz Aff.). This testimony could have made it more likely that the jury would discount petitioner's testimony that he went to Montgomery's house to "swing by and talk" to Montgomery about Montgomery's conduct of "patting the girls on the butt or saying inappropriate stuff to the girls" which he described as not "even really that big of an issue." Dkt. # 16-3, Tr. Trial vol. 4, at 31 [382]. As respondent contends, had trial counsel presented testimony from Smith and Seitz about an alleged rape, petitioner "would be admitting to the jury he took a friend—and a knife—to confront the man who allegedly raped his daughter, but also insisting he acted in self-defense when he killed the suspected rapist." Dkt. # 15, Resp., at 22. Finally, Turner would have testified that he knew Montgomery and petitioner were friends, that he didn't know either of them very well, that sometime before the murder he overheard them talking about

16

Montgomery making "unwanted sexual comments," and that, on the night before the murder, he gave Montgomery a ride to petitioner's house where Montgomery and petitioner "had a lengthy conversation" that Turner did not hear. Dkt. # 15-1, Appl. Evidentiary Hr'g, at 11 (Turner Aff.). It is not clear how Turner's testimony would have provided the jury any information it did not already have from petitioner's own testimony that he knew Montgomery and that he had previously talked to Montgomery about his allegedly inappropriate behavior toward petitioner's daughter and other young girls. Dkt. # 16-3, Tr. Trial vol. 4, at 31-32 [382-83]. It is even less clear how Turner's testimony could have advanced petitioner's claim of self-defense. In short, had trial counsel interviewed Smith, Seitz, Belt and Turner, it would have been entirely reasonable for counsel to make a strategic decision not to call any of them as defense witnesses. In turn, it was entirely reasonable for the OCCA to find no "strong possibility" that counsel performed deficiently with respect to investigating or calling these witnesses.

Third, it was not objectively unreasonable for the OCCA to conclude that trial counsel did not perform deficiently by failing to introduce evidence at trial regarding the amount of methamphetamine in Montgomery's blood. As the OCCA reasoned, the jury had before it undisputed evidence that Montgomery smoked methamphetamine before petitioner fatally stabbed him. Dkt. # 15-4, OCCA Op., at 9. Fullhart, Broomhall and petitioner all testified that Montgomery was smoking methamphetamine. Dkt. # 16-1, Tr. Trial vol. 2, at 170, 181 [207, 218]; Dkt. # 16-3, Tr. Trial vol. 4, at 37 [388]. And petitioner vividly described how the methamphetamine affected Montgomery. According to petitioner, Montgomery was "shaking" as he attempted to load the glass pipe with methamphetamine, he was "acting high [and] kind of nervous," "his pupils [were] the size of his whole eyes," and "his whole eyes [were] like black, total blackness." Dkt. # 16-3, Tr. Trial

17

vol. 4, at 35, 53 [386, 404]. As the OCCA reasoned, petitioner fails to explain how presenting evidence of the amount of methamphetamine in Montgomery's blood or evidence to explain the effects of methamphetamine (beyond petitioner's own description of how the methamphetamine affected Montgomery), would have assisted the jury in determining whether Montgomery, in fact, pointed a rifle at petitioner before petitioner fatally stabbed Montgomery. Under the particular circumstances of this case, it was not objectively unreasonable for the OCCA to reject petitioner's claim that counsel performed deficiently with respect to the failure to present the jury with evidence of the specific amount of methamphetamine the medical examiner found in Montgomery's system.

For these reasons, the Court agrees with respondent that § 2254(d) bars petitioner's request for habeas relief on claim two.

## *CONCLUSION*

Based on the foregoing analysis of petitioner's federal claims, the Court concludes that petitioner has not shown that his current custody under the challenged state-court judgment violates the Constitution or other federal law. 28 U.S.C. § 2254(a). The Court therefore denies his petition for a writ of habeas corpus.

### Certificate of Appealability

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the [petitioner]." A district court may issue a certificate of appealability "only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, a court rejects a petitioner's constitutional claims on the merits, the petitioner must make this showing by demonstrating "that reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Because the Court finds that reasonable jurists would not debate the correctness of its assessment of petitioner's claims, the Court declines to issue a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note the substitution of Scott Crow in place of Joe M. Allbaugh as party respondent.

2. The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3. A certificate of appealability is **denied**.

4. A separate judgment shall be entered in this matter.

**DATED** this 15th day of September, 2020.

*[signature]*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE